Case 15-3450, Peggy Barnum v. Ohio State University Medical, et al. Oral argument, 15 minutes per side. Mr. Close for the appellant. You may proceed. Mr. Close. Good morning, Your Honors. If it please the Court, the focus of this case today by the appellant is about whether regarded as disability perception, as defined under the ADA, is exempt from application to an employer under any and all circumstances involving an order to undergo psychological fitness for duty because the 2,000 ADA amendments do not exempt employers from regarded as disability perception for fitness for duty exams. The appellant advocates there must be some threshold under the ADA, and as her case demonstrates, that behind that threshold, there is no lawful reason for an employer to invade an employee's privacy by requiring a psychological fitness for duty exam when there is no reasonably demonstrable, particularized facts of unacceptable performance or employee safety. Employee disability was improperly treated by the trial court under the existing law. Not just any verbalized concern about mental health of an employee permits a formal and invasive inquiry into the mental state of the employee. This is the reason that the ADA and the Rehabilitation Act have been established and amended, and the appellant is seeking to correct that interpretation previously held under Sullivan to currently meet the requirements of the ADA. The facts of the case are relatively complex, given the number of persons involved, but for the appellant, Peggy Barnum, she worked for the university from 1974 to 1986, and then returned again in 2006 to the present. In the interim, she works three days a week as a certified nurse anesthetist. She also works two days for a private employer named the Eye Center. Now, throughout the entire period of this case, beginning a few months before October 7th, and I will use that as a flag and anchor date for purposes of the facts. Prior to that, she also worked for the Eye Center as well. Now, on October 7th, 2011, Mr. Charles Martin, her supervisor, received a phone call from a co-worker of Ms. Barnum's by the name of Elizabeth Hill. Elizabeth explained to Mr. Martin some things that she had observed about Ms. Barnum, and there were concerns regarding the fact that she was going through a divorce, had had some other problems, and wanted Mr. Martin to be aware of those, and she had some concerns about Ms. Barnum's mental health. Now, in her deposition, Ms. Hill stated that she could not remember exactly what specific words she used or what the specific contents of the conversation were, but they were to the effect that she had concerns about Ms. Barnum, and that she thought that Ms. Barnum could benefit from some time off to herself. Mr. Martin, hearing those concerns, then went to the office of the director of the department, Dr. Harder, and informed Dr. Harder of this. Dr. Harder, in turn, called a Dr. Stephen Pariser, who is the chair of the Licensed Independent Practitioner Health Committee, and he and Dr. Harder both called Peggy Barnum while she was working at the Eye Center, and she informed them when she answered the phone that she was in the process of working with a patient. They informed her at that time that they had concerns about her well-being, and they wanted her to report to an ER for an assessment. She had indicated at that time that she had concerns about going to OSU's ER because her husband had worked for them, and maybe because she was going through a divorce, had privacy concerns. And Dr. Pariser at that time says, well, if you don't go there and you go somewhere else, it's more likely your husband will find out about your going anyway if you go to another hospital around OSU, so it would be better if you go there. Well, Ms. Barnum interpreted this as being an order and coercive in nature to go to the OSU, which she did. She went to the OSU ER. She was examined by Dr. Nadorf. There were also attendings at that particular examination. This is the examination that you say she should not have been required to go to? No. Which is the examination you say she should not have been required to go to? The examination that originally began with the hospital in which they had and they sent her to, it is the one that she should not have gone to. Subsequent examinations as well. The main argument you're making this morning is that she should not have been required to go to that. That's correct. What did they have at the time they required that? Did they have recommendations that she get a psychiatric evaluation? Well, Dr. Harder and Dr. Pariser told her to go to the ER for this assessment. The ER is the? Emergency room of OSU Medical. And the reason that they told her to go there was that they had been told by her supervisor, Mr. Martin, who had been told by another coworker that she had had a conversation with Ms. Barnum in which there were comments that were made that she believed Ms. Barnum could benefit with something. Going to the ER is not getting a psychiatric evaluation. Well, it was to be examined for the purpose of whether or not she would remain and continue to work, as it turns out from the future and what it cascaded into after that. They're telling her we have concerns about your ability to do your job. A lawyer can say I have concerns about your mental and ask you to go to the emergency room or you're saying they can't even do that? I'm saying that that's a perception of a disability unless they have some particularized facts. Well, they have what this lady reported. They're not asking her necessarily to get a psychiatric evaluation. They're just asking her to go to the emergency room. Is that correct? I'm trying to get the facts from you. They're telling her to go to the emergency room on the basis that it's been reported to her that she's having psychological problems. Right. So on that basis. So that's a violation of the ADA? It's a violation when there's nothing else to support her performance as an employee. That's the essence of perception. There was absolutely no report from Ms. Hill to Mr. Martin that she wasn't working the way she was supposed to do. She was involved in any patient care issues. Her only request was she could benefit for some time. That was Ms. Hill's take on the matter. And based on that, they order this employee to go to the emergency room to be evaluated on the basis of her mental health. What could they have done? They could have asked her to report to work Monday morning, sat down and said, we've had reports from this coworker, we're investigating this, begun an investigation, called in Ms. Hill to talk to her about it, which, by the way, they never did. They've never talked to one single employee in all this, and there is no record at all of any investigation that anybody did regarding any allegations that were made. So based on the hearsay within hearsay within hearsay, sending her to the ER, that's what they ended up doing. When, in fact, they could have sat down, talked to her and said, here are the concerns we have. We have this LIPC committee, and that's what Dr. Prieser chairs up. And that could have been utilized. It wasn't. And that's the issue, again, where the trial court talked about that, especially in putting her back to work. It said, you know, there was no evidence that this pathway changed when they wanted to put her back to work. But, in fact, they did have a pathway. The first pathway was to have her interviewed by the committee. The committee could then make one of seven recommendations that they had, which ran a full gamut of different things. But none of those things involved sending her for an independent medical exam or a psychological assessment. Well, counsel, the only thing I see missing in your recitation of the facts is somebody as early as early October or in September, several of the people that she worked with, not just Ms. Hill, reported that she apparently was having troubles at home and that she was disturbed and that somebody at least thought that she might have a suicidal intention. And what the district court found was that she had been sent to that emergency department to be evaluated for suicide risk. That's a crisis, if it turns out it's true. And that's exactly how one gets to what they deal with somebody they think is suicidal. They refer them to an emergency room. You can't just show up at the door of a psychiatric facility and knock on the door and get taken in. You've got to go through the emergency room to get there. So what was improper about that? Well, the first thing, Your Honor, is that there was no other evidence at that time to support that conclusion. But she's a nurse. She's dealing with patients. As I understood it, she even was in operating rooms. She'd gotten teary-eyed in one of the operating rooms. People were concerned about her. They wanted to help her, and at some point she, according to the district court, said that she thought her co-workers' concern for her was sincere and genuine. Whether or not her co-workers think or whatever they think is sincere and genuine is not dispositive.  Whether she thinks they're sincere and genuine doesn't mean that her employer has the right to send her for a psychological assessment. In fact, this court's already held that being suicidal and unfit meets the definition of regarding someone as disabled, and that was in Chandler v. Specialty Tires of America. In her case, there is absolutely no evidence on October 7, 2011, of any of the things you spoke about, nor was there any evidence of any of the things that you spoke about developed by direct testimony. Well, I'm not making this up out of thin air, Counselor. No, I'm not. That's what the district court found. The district court found that information because the district court clearly erred in determination of facts. Well, okay, one of the doctors said that he got a number of reports about people being concerned about her in the operating room. Is that not true? That's what one of the doctors said. I'm out of time here, but I'm going to respond to that. OSU has a process for patient safety. They have a database for patient safety. They document everything they do for patient safety. They're all undocumented. Okay. There is no documentation here. There is not one single Post-it, as I briefed it. This doctor said, did that doctor testify? Two years later in his deposition. Okay. Did they have anybody who said these things to him testify? No. Okay. And then what about after she had trouble with adjusting the bed and sort of broke down? I don't necessarily know that she broke down. She said, as some people have, what euphemistically is called a bad hair day, sometimes I just can't do anything right. I mean, being able to plug in a bed is not an essential job duty of a certified nurse anesthetist. It doesn't happen. It didn't happen in front of the patient. The patient was out at the time. Okay. And then what about her own therapist who recommended that she get psychiatric care? Well, her own therapist is now put on notice because of this entire process. It's kind of fruit of the poisonous tree. All of this stuff cascades, and she's referred to her therapist because of that. And when she's referred to her therapist because of everything that's gone on in the ER, and she agrees to go to that person and gives this information, none of that would have ever happened. And the therapist wouldn't have been privy to that information had she not been sent in the first place. There was really no need to send her because she was already going to the therapist. But now you have these reports that are coming in that are unverified, undocumented, with absolutely no basis in reality whatsoever that she's been subjected to, and they're saying you have to go to your therapist, and she agrees to do that. So she's cooperating with them. But once that's done, I mean, the ER doctor says she's not a danger to herself or others, diagnoses her as just basically being depressed. Right, but he says I can't comment on her fitness for duty. That's why they sent her. They sent her to the ER to determine whether or not she was fit for duty. They have no interest at all in her personal life. Right, but the doctor didn't answer that question, whether she was fit for duty. Where could they have sent her to determine whether she was fit for duty? Or are you saying that they didn't have the right to try to find out whether she was fit for duty? They could have sent her to the ER to determine whether she was fit for duty. But the doctor said he couldn't address that. Didn't the ER doctor say she's not a threat to herself, but as to fitness for duty, I can't comment on that? That's what he said. Right. Why he said that with an attending physician and everybody else there is going to be a question that remains. The issue was when she went there for suicidal ideation, did he determine that she was engaged in suicidal ideation? No, he was saying she shouldn't have even been sent to him. She shouldn't have been sent to him. No, she shouldn't have been sent anywhere. Were they allowed to do anything at any particular point to determine whether she was fit for duty? When they examined her, they were examining her, insofar as the law would require is they're allowed to examine her for her fitness for duty,  physically capable of working, that's what she's there for. Otherwise, they're not allowed to examine her for anything. I'm just trying to answer my questions. Were they allowed to send her to the ER doctor to determine if she was fit for duty? With the information they had, no. Okay. At some point, were they allowed to determine whether she was still fit for duty? Not under these facts, never. Okay, notwithstanding the comments, the supposed comments, or the incident with the bed? Correct. Okay. What if those comments had been documented? No. The Kroll case speaks specifically to two instances that Kroll, as a paramedic, was engaged in, and those two comments in Kroll involved direct patient care threat assessment and texting while you were driving a vehicle, an emergency vehicle, and then refusing to give a patient oxygen. Those are direct threats to patient safety, and this court, even in that case, said that really wasn't enough to show that that was an essential job that she wasn't doing or you could reasonably rely on that. So, no, that wasn't a bed. Thank you, counsel. Thank you. May it please the Court, my name is Rory Callahan with the Ohio Attorney General's Office here on behalf of the appellees, the Ohio State University Medical Center, and the remaining individual defendants. The district court's decision should be affirmed. The two claims that have been raised on appeal are First Amendment retaliation and the ADA Rehabilitation Act. I think the questioning has been on the ADA Rehabilitation Act issue, so I'll address that. First, Judge White, as you noted, Dr. Arbona, the chief anesthesiologist over at OSU's East Hospital, had also called Dr. Harder a day or two before she was contacted and asked to go to the emergency room, and he reported that he'd had a number of comments over the preceding weeks. He'd not contacted Dr. Harder about that, but after a specific incident in an operating room where Ms. Barnum had actually been asked and been replaced by another CRNA, he reported that to Dr. Harder, and the issue involved adjusting the height of an operating table prior to the procedure. And as Dr. Harder, an individual defendant, and the department chair for the anesthesiology department reported, it's something that's commonly asked of CRNAs, and it's one of the simplest things they do during an operation procedure, as opposed to administering medications. Anybody who messes something like that up has to go through a series of evaluations? No, no, it was based on developing comments over a series of weeks, because at the same time Dr. Harder was contacted by Dr. Arbona, Chuck Martin, the chief CRNA, also approached, independently approached Dr. Harder, and reported his conversation with one of the other CRNAs at OSU East, which again is a separate facility from OSU's main medical center. And then a number of the CRNAs were worried both about Peggy Barnum's conduct in the operating room, and just the concern that she could be suicidal, she could be prepared to hurt herself. Chuck Martin had also known from two previous conversations over the past couple of months that Peggy Barnum was going through very difficult circumstances in her personal life. He hadn't acted on that. People who, just because someone's upset, doesn't mean they're going to go kill themselves. I mean, basically, it's almost like your friends or co-workers can make a few comments, and then all of a sudden you have to go through a series of psychiatric exams. And I disagree with both of those characterizations, Your Honor. First, it was a number of comments over a period of weeks. Is there a procedure to document comments or whatever? No, there is an event reporting system when specific incidents with patients occur. I would argue that OSU doesn't have to wait for an accident to occur until they can report something. And here, the district court recognized that a CRNA is in a highly important and sensitive job. She works in operating rooms that she's assigned to each day. She not only administers anesthetic, she's got a responsibility to continuously monitor the patient's respiratory system during the medical procedure. Did she do the same thing at the eye center, or were the functions different? It's certainly not a hospital at the eye center. I think there was testimony by Dr. Harder, too, that although he's not aware of what they specifically do, it's certainly not a hospital where the whole gamut of surgical procedures are entered into and the whole gamut of anesthetic is run. So they're different work settings. And OSU didn't have any information about what her work was at the eye center and so didn't rely on any of that information. Dr. Harder, again, working at a separate facility, had a reasonable basis to contact Dr. Pariser, a psychiatrist, who is the chair of the Licensed Independent Practitioners Health Committee. And both Dr. Thomas, the chief medical officer, testified, and Dr. Pariser testified about the committee's role. And they refer practitioners who could have a DUI, could fail a drug test, have a substance abuse problem. Did he go through the committee? Did he use the committee? Did he convene a meeting of the committee? No. Dr. Harder contacted the chair, Dr. Pariser. They decided, based on the information they had, both the concern about her conduct in the operating room and the weeks of comments from the other CRNAs, surgeons, and other anesthesiologists. I know what happened. So did Pariser have the authority of the committee to just say, well, let's get a psych exam? He did not convene the committee, both out of concern for the workplace but also as a possible suicidal ideation, a suicide risk. They asked her to go to the emergency room on that Friday, October 7, 2011. Okay, but then the doctor said she's not a risk. Well, the doctor was making a specific analysis based on the emergency setting. He did take a history from her. He identified a number of issues, including the end of her divorce of 28 years, the fact that her adult daughter had been charged with assaulting her and was facing criminal charges. Look, I can't begin to imagine the kind of personal lives and things that people are going through, doctors included, brain surgeons included, at hospitals. We normally don't verify that everything's okay. So that the doctor would say she's not a risk, yeah, these things are going on in her life that may be problematic. I mean, I think that would apply to half the people at a hospital. Well, Dr. Nadorf, the resident who evaluated her that night, did recommend several different treatments. He didn't recommend no treatment. He said they could voluntarily admit her. He just didn't think there was a basis to pink slip her. He offered her the option of partial hospitalization with intensive outpatient therapy. He also suggested a minimum she receive a psychiatric assessment. Now, she'd also been seeing an EAP counselor, who she'd already seen three times before she was asked to go to see the emergency room. Is that Holly? Yeah, that's Diane Holly, correct. So she'd been seeing Diane Holly before she was sent to the ED? Yes. Did they know that? Did OSU know that? No. No, she told them that after she went to the emergency room, and she also told Dr. Nadorf that at the emergency room. That person had recommended that she receive a psychiatric evaluation, but OSU just didn't know that? Diane, OSU didn't know that at that time on October 7, 2001. Had she recommended it at that time? Didn't she recommend it after, when she went to see her after? Diane Holly was not deposed, and we don't have specific notes from her reports from the first three sessions. We've got her report from that week after, Your Honor. But she did relate a number of different comments that she'd made in the previous sessions, including the comment that was referenced from the brief that when Diane Holly said, Peggy Barnum doesn't understand the significance of her own statement, that she's, quote, losing it at work every day, unquote. That's what Diane Holly put in her report that she sent to Dr. Pariser and the Licensed Independent Practitioners Health Committee that they had in front of them when they asked her to receive a psychiatric assessment. They gave her the opportunity to see a doctor at OSU. She declined. They gave her the opportunity to see a doctor in OSU's plan network who was not an employee of OSU. She declined to do that in November 2011. She went to see Dr. Thomas, the chief medical officer for OSU, to ask what other kind of doctor she could see. And he said the equivalent of a fitness for duty evaluation by another doctor would be acceptable as long as that doctor had communicated with Dr. Harder so that Dr. Harder, like any IME, could relate some of the specific requirements of her job and some of the specific incidents that had formed the basis for their request. And she didn't do that. She had actually seen a doctor on November 16, 2011, the week before she met with Dr. Thomas, but she didn't tell Dr. Thomas about that. But didn't she then go see a doctor who said she's fine? She didn't give that report to OSU. She didn't get that report and didn't give the report to OSU until February 2012, almost three months after she met with Dr. Thomas. She didn't update OSU at all during that time. Okay, so what happens in February? She gives the report that says she's okay. She didn't agree to let Dr. Masterson, her other doctor, she didn't agree to let Dr. Masterson talk to Dr. Harder. Why should she have to let Harder have a conversation with her doctor? It's a common element in a fitness for duty evaluation or an individual medical examination that the employer shares some information about the employee's job, about conduct. That's fine. What was wrong was saying, that's fine, give it to him in writing. Tell him all about my job. Tell him everything you want to know. She wouldn't sign a HIPAA release for them to communicate with the doctor, and she didn't sign that HIPAA release until June of 2012. No, she said it would be fine for you to give the doctor all of the information you want to give him, and if you have questions for him, give them to him or me in writing, and you will get all the information back. Well, first, again, they don't know who the doctor is until about February 22nd of 2012, when they actually received the report. And, again, she did not sign the HIPAA release. What she did was in April 2012, she sent her own statement saying, you can submit written questions to me, and if I think they're acceptable, then I'll give them to Dr. Masterson, which was an acceptable release from OSU's perspective. Are there any cases that say that the employer has a right to have direct conversations with the doctor? I think that's a common aspect of a fitness for duty evaluation, that the employer would share information with the doctor. Okay, you keep repeating something, and I'm asking a different question. I think I'm saying, yes, share information with the doctor. Give the doctor whatever information you want, including all of your concerns about behavior. Are there any cases that say, beyond that, you have a right to have a conversation with the doctor? I can't cite a case to you right now, Your Honor, that articulates the question in that manner. That's why I've said, you know, as a practical matter, I think that's the way a fitness for duty evaluation typically works, that the employer would share information with the doctor doing the evaluation so they can look at a job description, so they can see if there were some specific issues that a patient hasn't identified to them in a history. But I don't have a specific case saying that that is or is not a violation. Again, the general case— Well, I agree with you on that. I keep asking you a different question. Do you have any cases that say that the employer has a right to call the doctor and ask questions, as opposed to giving information, a free right to ask questions all about whatever they want, that they have a right to have a HIPAA release so that they can ask the doctor anything they want? I mean, and I don't have a case that articulates the issue the way— It seems to me, I mean, that there's a far— and that this person is fit for duty, that that's something very different from having a right to call the doctor and saying things like, well, what did she talk to you about, and what are her concerns, and exploring all the confidential things that the person said to the doctor that may have nothing to do with— I mean, it's up to the doctor to decide whether those things affect the person's ability to work. It's not for the employer to make an independent decision whether, well, maybe the doctor thinks the divorce isn't that bad, but, you know, I think it makes a difference. And, Your Honor, respectfully, I don't think there's anything in the record indicating that the doctors at OSU did that. I mean, Dr. Harder and Dr. Pariser— it's clear that he was not making a diagnosis of Peggy Barnum. He was not her treating physician. He was simply, again, another independent practitioner who has experience in these areas, particularly dealing with substance abuse problems. And he and the other members of the committee, who are all employees of OSU, were just bringing their own independent experience to the circumstances that they saw in Peggy Barnum's case. They're not her treating doctors, and I don't think there's anything in the record indicating that Dr. Harder or Dr. Thomas, when they talked to Dr. Masterson finally, had that kind of invasive conversation that you're concerned about. And I don't think anything in this case sets that standard. How do you distinguish the ambulance driver case? Well, the Crow case, the one note I'd make is that that case and that argument about a test wasn't made in the district court. That's a new argument on appeal. The arguments in the district court were more just standard disparate treatment arguments. But as far as the Crow case, even within the Crow case, they cite specific kinds of jobs, police officers, firefighters, juvenile officers, correctional officers, who work in stressful situations that concern public safety. And I would say a CRNA, working patient care in a hospital, in an operating room, is analogous to that, where if there are indicia of the employee operating under a great deal of stress, that it's perfectly appropriate for the employee to recommend that the employee receive the equivalent of a fitness for duty evaluation. The other thing I'll note is that the district said, we'd cited the Sullivan versus River Valley School District case, and the appellant didn't have a good response to that and didn't respond to that case at all. That that's 15 or 16-year-old case law. That the employer can recommend an employee get the equivalent of a fitness for duty evaluation without suddenly being found overregarded, the employee is disabled. And what happened between April and November? Well, in April, she still hadn't signed the release. In late June, she signed the release. In July, Dr. Harder and Dr. Thomas spoke with Dr. Masterson for the first time. She had increased her hours working at the other job, so she had to reschedule a meeting. It wasn't until late August 2012 that she met with the Independent Practitioners Health Committee again. They recommended a reinstatement. That was evaluated. There was another meeting held, and she returned to work in early November 2012. What happened from August to November? Part of it was her scheduling. She had increased her work hours at her second job during that time, and she asked to reschedule the meeting at different times. But she was reinstated, and to my knowledge, she continues to work there since about November 2012. So throughout, the delays were caused really by Ms. Barnum, by her refusal to see the OSU doctor they offered to her, her refusal to see another doctor who was not an employee of OSU but in the network, and then her not identifying her own doctor that she was given the ability to choose for several months after that until February 2012, and even at that time, not agreeing to those initial requirements that they had asked of her to let them speak with the doctor. Did they speak to Holly? I think there was a phone call where Dr. Pariser introduced himself, but then she sent a written report that Pariser and the committee reviewed that's in the record. I think it's Exhibit 25 to the plaintiff's deposition. When did the committee first meet? The committee first met around October 25th of 2011, I think. How is it that all of this went for so long without being under the auspices of the committee? I think the committee doesn't have standing meetings. They convene on an as-needed basis, and so Dr. Pariser was acting as the chair on behalf of the committee initially, and it was really the committee. So there wasn't even a requirement at that point that she receive a psychiatric assessment. Dr. Pariser, they'd asked her to go to the emergency room. He collected the report from Diane Holly. So he was acting for the committee? He was, and actually, I think there was an initial meeting of the committee that was also rescheduled that Ms. Barnum didn't come to, so that's the reason it was two weeks later when the whole committee of 8 or 10— All of the stuff that happened leading up to February, from February to June, all of that activity, Dr. Pariser was acting for the committee? Well, and there was a different chair during that time too, but Dr. Pariser had retired from OSU and was not there in August 2012, and the committee met again. So the committee only convened and met with Peggy Barnum on two occasions in October 2011 and August 2012. Okay, so when something like this comes up, it's not handled by the committee necessarily? I guess the way I would characterize it, Your Honor, is that Dr. Pariser is collecting information for the committee, so getting the report from Diane Holly, getting the other information, and then after the second report, after they'd had a chance to speak to Dr. Masterson in July, that information is collected and shared with the committee. So the committee is just the end body. It's not the body that decides whether further investigation is necessary. Well, the committee actually makes a recommendation to the chief medical officer who makes the decision about privileges or some other job action. But the committee does not conduct the inquiry. The committee, you simply go to the committee when you have all the information assembled, information that someone else decided was necessary, and then you ask the committee. There is a report that the committee makes that they made in October 2011 and then again in August 2012 recommending her reinstatement. So they do make a report after the committee meeting. The chair does collect information with some discretion on behalf of the committee, but I don't think the chair is operating wholly independently of the committee, Your Honor. And with that, we'd have to affirm the decision of the district court. Thank you, Your Honors. Do you have your rebuttal time? A few things. The appellant did appear in front of the committee. The committee has investigatory authority with regard to requiring the appearance of the appellant, and she did, and she appeared in front of the committee. Secondly, Dr. Pariser specifically testified in a peer group review that the committee doesn't need a release from someone in the appellant's position in order for them to talk to their attending physician or treating physician. That's not necessary. They were requiring her to have that, and it wasn't necessary. That was his testimony. But he thought it was contentious. And, in fact, he said some people may think that she's paranoid. I don't, but some did, which goes to the issue, by the way, of the court deciding there were no stereotypes involved. Well, there were. Can you keep your voice up? Yes. The court said there were no stereotypes involved, and Dr. Pariser referred to her as paranoid, said he didn't think she was paranoid, but other people had. The problem is there's no evidence for any of this. Can I ask a question just so I understand where we are in your argument? You have a First Amendment argument and a disability discrimination argument. Yes. And, thoughtfully, you decided to focus on the disability discrimination argument, although I recognize that there are considerable arguments under the First Amendment as well. Yes. Just looking at the disability discrimination argument, your focus this morning was on how much her employer knew when, on October 7th, she was referred to the ED. Is that right? That would be correct. A lot of the discussion in the last few minutes has been on activities that happened after that. Those are only related to the First Amendment claim. Is that true? Is there some disability discrimination after October 7th? Yes, there is. What is it? I'm confused. Requiring the appellant to attend and participate in a fitness for duty examination by any physician, whether it's OSUs or her own. At what point did that happen? That happened when she went back. What date did that happen? That would have been around October 21st or so when she had the first meeting with the committee. The problem is that the committee doesn't have... The committee required her to do something because it considered her to be disabled. Is that the argument? Yes. And the committee doesn't have... When was that? Around the 21st of October, I believe. At that point, they had more information, though, right? They had more information that had been gathered from Ms. Hawley, and Ms. Hawley's information, by the way... Is there any other time when they violated the anti-discrimination statutes? Every time... One was October 7th and another was October 21st. Is there another time? Every time they made inquiry and requested her to get information regarding her medical state or fitness for duty was a violation. Every single time they did that. But they're allowed to do that when they have a certain amount of information, right? But it goes through the initial information. It's kind of a fruit-of-the-poisonous-tree argument. Well, so you're saying if it's a fruit-of-the-poisonous-tree, which trees were poisonous, I guess is what I'm asking. Because you can just sort of say, well, it was all considered disabled, and at various times they didn't have enough evidence. But I was under the impression that the disability law was to the effect that you can't require them to go to a psychiatrist unless you have a certain threshold of information, which I understood the argument at the level of October 7th. Now they get more information. They want further input. Well, that's just... Further evaluation. That's just it? I'm sorry. That's what? You've hit the nail on the head when you said that there's some threshold. In fact, there isn't. That's why we've appealed this case. There is no threshold. We have... I'm saying the law provides a threshold, and the question is whether they've met it, whether they've crossed the threshold. So there's some kind of line at which they can ask for a psychiatric evaluation, presumably, right? No. They can never ask for a psychiatric evaluation no matter what their input is? They can ask any time. That's the issue. There's no initiating threshold based on... And the essence of this case, the distillation of facts, is this. On October 7th... I'm not making my question clear. He's asking about the law, not what they did in this case. The law, as far as a threshold goes, if you look at Sullivan, Sullivan says if it's not readily apparent... Oh, the standard is readily apparent. Well, it would have to be... Well, no, if it's not readily apparent, then you can ask for a fitness for duty exam. And that's what you're saying has not been met? Well... I'm just trying to understand your argument. No. The problem I have with the law is that if you read the law that says if it's not readily apparent, that you can then ask for a fitness for duty examination based on disability, that in order for it not to be readily apparent, it has to be perceived. Because otherwise it would be readily apparent, and you would be allowed to ask for it. But the courts have gone beyond that, and they said if it's not readily apparent. So how far back along the path of not readily apparent are you allowed to start? And in this case, not readily apparent meant evidently one phone call from an individual that two days earlier had had a conversation, had had some concerns, when at that moment, October 7, 2011... I was asking you if there were later dates, because you're saying how much did they know when? You know, it's like the Watergate, you know, what did they know when? Right. Right? On October 7, you say all they had was a certain amount of information, but for instance, they didn't have the Diane Hawley input. Later they did have the Diane Hawley input. Right. Well, why wouldn't... If she recommended that he receive a psychiatric evaluation, that it seemed to me would be enough for them to go ahead and insist on a psychiatric evaluation. But you could say, well, it's not. But then that's a different argument from the argument with respect to October 7, and that's where I get confused. I would argue this, and this is one of the reasons I've off-quoted that, you know, summary judgment motions are not trials on paper. However, but with regard to Ms. Hawley, she had already been going to see Ms. Hawley. She had several sessions with Ms. Hawley until OSU sent her to Dr. Nadorf or to OSU and then required her to do certain things like follow up with her. Until then, Ms. Hawley didn't contact OSU and say, we've got a real problem here. I mean, you've got Tarasoff that says if a doctor suspects something's going to go wrong, they've got to notify somebody. What do you draw from those post-October 7 activities that you're describing? What's the legal relevance of them? That never would have happened. All of that... All right. So that's in the nature of what harm she incurred. Correct. Okay. Correct. I think I understand. Let's see that your time is up unless there are further questions. Thank you, Counsel. Thank you very much, Your Honors.